**FILED**

JUL 1 8 2005

**MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

VILLAGE OF DOLTON, on
behalf of itself and all others similarly situated,

           Plaintiff,

vs.

TASER INTERNATIONAL, INC., a Delaware
corporation,

           Defendants.

Case Number

# 05C 4126

**JUDGE HOLDERMAN**

**MAGISTRATE JUDGE KEYS**

## CLASS ACTION COMPLAINT

Plaintiff, the Village of Dolton ("Plaintiff"), by its undersigned attorneys, on

behalf of itself and all others similarly situated, files this Class Action Complaint and

alleges as follows:

### NATURE OF THE ACTION

1.     This is a class action brought on behalf of a nationwide class of all entities

that purchased "Tasers" from defendant for law enforcement purposes. This case involves

Taser devices that defendant markets as "safe" and "non-lethal," despite the fact that the

product has never been adequately or independently tested for safety and has been involved

in numerous deaths and serious injuries across the country.

## PARTIES

2.     Plaintiff the Village of Dolton is a municipality located in Cook County, Illinois.  The Dolton Police Department ("Dolton P.D.") is a police department with 44 full-time and 15 part-time state certified police officers that operates within the Village of Dolton, with its headquarters at 14030 S. Park Avenue, Dolton, Illinois 60419.  The Village of Dolton purchased Tasers for use by the Dolton P.D. as described herein.

3.     Defendant Taser® International, Inc. ("Taser International" or the "Company") is a Delaware corporation with its principal place of business at 7860 E. McClain Drive, Suite 2, Scottsdale, Arizona 85260.  Taser International manufactured, promoted, marketed, distributed, developed, and sold Tasers in this District and in interstate commerce.

## JURISDICTION AND VENUE

4.     Plaintiff alleges an amount in controversy in excess of $75,000, exclusive of interest and costs.

5.     This Court has jurisdiction over this action pursuant to the provisions of 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between the Plaintiff and Taser International.  Further, this Court has jurisdiction over this action pursuant to the Class Action Fairness Act, codified at 28 U.S.C. § 1332, because there is complete diversity and because the aggregate amount in controversy exceeds $5 million.  See 28 U.S.C. § 1332.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Taser International conducts business in this District and the contacts of Taser International with this District are sufficient to subject Taser International to personal jurisdiction herein.

## FACTUAL ALLEGATIONS

A.    Background

7.    At all times relevant hereto, Taser International manufactured, created, designed, supplied, marketed, advertised, and otherwise distributed Tasers in interstate commerce.

8.    Defendant's Tasers are handheld devices that fire two wires tipped with metal barbs. Tasers look and operate like plastic guns. After firing, the probes discharged from the Taser remain connected to the handheld device by high-voltage insulated wires that electrocute, via the transmission of electrical pulses, the target person. According to the Company, these electrical pulses, called "TASER-Waves or T-Waves," are transmitted through the body's nerves "in a manner similar to the transmission of signals used by the brain to communicate with the body."

9.    The Company states that, T-Waves "temporarily overwhelm the normal electrical signals within the body's nerve fibers, impairing subjects' ability to control their bodies or perform coordinated actions." As discussed in more detail below, the Company's T-Wave "theory" is just that – a theory wholly lacking in objectively verifiable data demonstrating how the Company's Tasers work, where the electricity travels in the human body, or whether those subject to its immensely painful electrocution live without long-term or short-term consequences, whether cardiovascular, respiratory, or otherwise.

10.    With the Company's latest Taser models, the initial "impairment" effect lasts up to five seconds, and the charge can be repeated for up to approximately ten minutes by repeated firing of the Taser.

11.    According to an internal Company "Memorandum of Law" dated May 3, 2004, Tasers are not classified as firearms by the Federal Bureau of Alcohol, Tobacco,

Firearms and Explosives because Tasers use compressed nitrogen gas as their propellant. Therefore, firearms-related regulations do not apply to the sale and distribution of Tasers within the United States. Tasers are essentially unregulated, and, in fact, are now being marketed and sold to the general consumer population.

12.     The Company makes several models of Tasers – some for law enforcement personnel and some for average consumers. The M26 – the first of the Company's current generation of Tasers – was introduced in late 1999; the Company's latest law enforcement model, the X26, was first introduced in May of 2003. According to the Company, the price for X26 Tasers is approximately $800. The X26 Taser is described as having a range of approximately 21 feet and delivers 50,000 volts of electricity to its target. The Company states that it shipped the first X26 Tasers in September of 2003, after "comprehensive medical safety testing was conducted."

13.     As mentioned above, the Company also sells Tasers to consumers. Specifically, the Company's M18, M18L, and X26c models are sold to consumers for prices ranging from $399.95 to $999.00. According to the Company, the X26c Taser "debilitates the toughest targets, without causing injury or lasting after-effects." Like the models sold to law enforcement agencies and departments, the X26c delivers 50,000 volts of electricity to its target.

B.     The Company's Bogus Safety Claims

14.     The Company describes itself as the market leader in advanced non-lethal devices and widely markets its Tasers expressly as "non-lethal," "safe" alternatives to guns and deadly force. In addition, the Company claims its Tasers have no adverse long-term health consequences. As a result of the Company's aggressive safety marketing and

purported "extensive" medical research, Taser International has enjoyed significant sales of its Tasers. Indeed, the Company's most recent annual report filed with the Securities and Exchange Commission on March 31, 2005, states:

> Federal, state and local law enforcement agencies in the United States currently represent the primary target market for our ADVANCED TASER and TASER X26 products. In the law enforcement market, over 7,000 law enforcement agencies have made initial purchasers of our TASER brand weapons for testing or deployment. These agencies include the Unite[d] States Secret Service, Los Angeles Police Department, Los Angeles County Sheriff's Department, New York Police Department, Chicago Police Department, Las Vegas Metropolitan Police Department, Seattle Police Department, the Royal Canadian Mounted Police, Miami Police Department, Denver Police Department, Houston (TX) Police Department, Fort Worth (TX) Police Department, Orange County (FL) Sheriff's Department, Chandler (AZ) Police Department, Philadelphia Police Department, and Minneapolis Police Department. In addition, 1,468 police departments, including Phoenix (AZ) Police Department, Ohio State Troopers, Cincinnati, San Diego, Reno, Houston (TX), Sacramento, Albuquerque, Citrus County (FL) Sheriff's Office and Clay County (FL) Sheriff's Office have purchased or are in the process of purchasing one TASER brand weapon to issue to each of their on duty patrol officers.

> We believe our Taser products could prove equally suitable for use in correctional facilities and have begun to see TASER devices deployed in correctional facilities such as those operated by the Los Angeles Custody Division and the State of Wisconsin.

15.     The Company's safety claims permeate its marketing materials. For example, the Company claims that "TASER devices use proprietary technology to safely incapacitate." Tom Smith, President of the Company and brother to Taser International Chief Executive Officer ("CEO") Rick Smith, recently told the *Rocky Mountain News* that the Company "stand[s] by the safety of [its] product. It does not cause deaths." Similarly, in the Company's "Certification Lesson Plan," Taser International states that there are "no reports of TASER weapons causing death," and calls its Tasers "health insurance for everyday circumstances."

16.     Further, when Taser International has purported to disclose the results of scientific or medical studies on Tasers, as discussed in more detail below, it has disregarded and obscured the studies' negative information. For example, Taser International claims that a Department of Defense ("DOD") study (the "DOD Study") proves that Tasers are "safe and effective." However, as will be shown below, DOD officials who were involved with and have reviewed the DOD Study have stated that it contains *no data whatsoever* to justify Taser International's claims that there is no risk of death or serious injury from the use of its product.

17.     The Company, in all of its marketing materials and in numerous, frequent public comments by its executives, states that Tasers are safe and non-lethal, going to great lengths to avoid any acknowledgment that Tasers are anything but perfectly harmless. In that regard, in a March 2005 public debate, Taser International co-founder and CEO Rick Smith stated that Tasers present    a danger comparable to "coming up behind your grandmother and screaming 'Boo.'"

18.     As a result of its concerted marketing efforts and demonstrably false claims, Taser International now reportedly equips about 7,000 United States police agencies, and approximately 135,000 of the nation's one million law and corrections officers. Sales to law enforcement agencies make up approximately 95% of Taser International's business.

19.     These law enforcement agencies and departments have been misled by the Company's safety rhetoric and, as a consequence, routinely use the Company's Tasers to subdue citizens in situations that do not warrant or permit the use of deadly force. For example, a May 2004 study in Denver, Colorado – where nearly every active duty police officer carries one of the weapons – published in *The Denver Post*, showed that in 90 percent

of cases subjects were unarmed, and that more than two-thirds of those who were charged after being Tased faced only a misdemeanor crime or a citation. Similarly, a study of Taser use in South Florida published in *The Palm Beach Post* in May 2005 revealed that Tasers had been used on at least three pregnant women, an 86 year old man, a 14-year-old boy and 13-year-old girl, and in at least 237 incidents to get compliance from *passively* resisting or fleeing suspects. The police officers mistakenly believe the Taser use is safe based upon the repeated bogus safety claims made by Defendant. Indeed, the Company's safety claims are so exaggerated that many agencies even feel free to issue Tasers to school police officers. In fact, reports on Taser International's web site show that, as a direct result of the company's bogus safety claims, Tasers are frequently being used instead of more traditional methods, such as seeking the assistance of mental health professionals. Tasers are being used repeatedly on unarmed individuals, children, people already under restraint, individuals who are physically disabled, and an overwhelming number of emotionally distressed individuals.

C.      Plaintiff's Purchases of Tasers from Defendant

20.      Plaintiff Dolton P.D. paid Taser International $8,572.98 to purchase Tasers and necessary replacement parts and supplies from defendant. True and correct copies of the invoices from Taser International to Dolton P.D. are attached hereto as Exhibit "A."

21.      At all times relevant to Dolton P.D.'s purchase of Tasers from the Company, Taser International uniformly represented in its standardized marketing materials that Tasers were safe, non-lethal, and that the Company had conducted extensive medical research on their safety. These representations were false and misleading when made.

22.      In connection with its purchase of Tasers and following the standard safety guidelines and instructions that were uniformly represented by the Company, plaintiff

Dolton P.D. created an "X26 Advanced Taser Policy" (the "Dolton Taser Policy"). A true and correct copy of the Dolton Taser Policy is attached hereto as Exhibit "B." Among other things, the Dolton Taser Policy addresses "Treatment of Persons Subject to the X26." In that section, the Dolton Taser Policy states that officers who use Tasers on offenders should evaluate if a probe has penetrated or otherwise injured the offender's skin. In addition, the Dolton Taser Policy states that "Officers must be aware that one aspect of potential injury in deploying the X26 against a violent or combative offender is that of falling from a standing position."

23.     The Dolton Taser Policy was developed based on Taser International's uniform safety claims found throughout the Company's marketing materials. At no time did the Company disclose to plaintiff Dolton P.D. that Tasers could result in death or serious physical injury, such as cardiac arrest. If the Company had done so, the Dolton Taser Policy would advise its officers of such risks and Plaintiff would have placed information regarding death and serious physical injury in the Dolton Taser Policy.

D.     Taser International Knowingly Concealed the Dangerous Propensities of its Tasers in its Uniform Promotional Materials

24.     As noted herein, the Company's marketing materials over the years repeatedly asserted that Tasers have no negative consequences and that they are non-lethal, despite the fact that people have been dying from Tasers since at least 1999. Further, the Company misleadingly states that it has conducted extensive medical and safety research on its Tasers. The reality, however, is that Taser International has never conducted that extensive research and that Tasers are being implicated in more and more deaths and serious injuries. Indeed, recently the scientific, medical, and law enforcement communities have

all concluded that additional, independent safety testing of Tasers must be done.

25.     The purported medical and safety studies conducted by Taser International to determine the health effects of its Tasers are dangerously insufficient. One of the primary scientific studies conducted by Taser International was performed by Dr. Robert A. Stratbucker, the Company's medical director (the "Stratbucker Study"). This study was released in the January 2005 volume of PACE (Pacing and Clinical Electrophysiology), the official Journal of the International Cardiac Pacing and Electrophysiology. A true and correct copy of the Stratbucker Study is attached hereto as Exhibit "C." The Stratbucker Study looked at the effect of Tasers on less than a dozen anesthetized pigs, not humans. Indeed, Taser International has *never* conducted an independent, controlled scientific study on the safety (either long-term or short-term) of using Tasers on humans.

26.     The Stratbucker Study examined the effects of Tasers' electrical discharges on the hearts of nine anesthetized pigs, each weighing approximately 150 pounds. The primary point of the 2003 study was to determine a "safety index" for each animal based on its weight. Data from the study purportedly suggested that the Taser presented a twenty-fold margin of safety for adult humans.

27.     In addition, in 1993, Dr. Stratbucker, then a paid consultant for Taser International, conducted a series of tests to determine if external application of Tasers could cause ventricular fibrillation in dogs. The study reported that 16 discharges of the Company's "Air Taser" and 192 discharges of its "Advanced Taser" [through electrodes in multiple configurations] resulted in no episodes of ventricular fibrillation in the dogs. Defendant touts this early study, but since it long predates the introduction of the Company's current Taser models, whatever statistical or medical conclusions it may have generated have

lost all relevance. Nevertheless, to this day Taser International still relies on its paid consultant's studies of outmoded Tasers on dogs, to evaluate, promote, and market the safety of its newer, more powerful, and more widely used Tasers on humans.

28.     Despite Taser International's purported studies, it has never analyzed in any scientific manner the impact and effect of Tasers on humans.  For example, Dr. Bill Lewinski, Executive Director of the Force Science Research Center at Minnesota State University-Mankato, and an advocate of the use of the Taser, stated in the December 12, 2004 issue of *Force Science News*, "there is no doubt that more really scientific research is needed on human beings, not just animals to help us better understand when and how to use the Taser devices." Dr. Lewinski posed several questions of primary concern, emphasizing "the need to know these and other answers."  His questions reflect the scientific community's fundamental lack of understanding of Tasers, such as: (i) how Tasers' electrical discharges impact the human body; (ii) how Tasers' effects can be properly neutralized after control of suspects is established; and (iii) what should be done when suspects suffer catastrophic responses (responses defendant says do not occur)?

29.     While Taser International touts its purported scientific research and medical safety studies as "extensive," the fact is that the Company's scientific and medical research lacks an in-depth analysis of the effect of the device on humans.  For example, Taser International has never conducted (independently or otherwise) research related to the health affects of Tasers on the central nervous system, cardiovascular system, or respiratory system of humans in the short or long term.  Therefore, the safety studies it has conducted are severely inadequate – as even Taser advocates will admit – and the true extents of the harmful effects of Tasers are *unknown*, in direct contrast to the Company's uniform

marketing scheme. Thus, despite touting its potentially deadly product as harmless, Taser International has no idea of how Tasers impact, among others, pregnant women, the elderly, young adults and children, individuals with heart conditions, and individuals with implantable cardiac devices.

30.     In a January 2005 article in *The San Francisco Chronicle*, Dr. Zian Tseng, a cardiologist at the University of California, stated that he believes Tasers are dangerous and can cause ventricular fibrillation. Dr. Tseng is well-placed to comment, because he regularly uses jolts of electricity to force patients' hearts into ventricular fibrillation. In his practice, Dr. Tseng installs electrical defibrillators into the chests of heart patients. And, like other cardiologists, when the installation is complete Dr. Tseng tests the defibrillator by jolting the patient with electricity to stop the heart, to see if the newly implanted device starts it up again. Dr. Tseng explained that he times his test jolts with "vulnerable periods in the cardiac cycle, when shocks can cause dangerous arrhythmias." It follows, Tseng says, that an ill-timed Taser can be fatal. "I think [Tasers] are dangerous," he told *The San Francisco Chronicle*. "If you are shocking someone repeatedly, it becomes a bit like Russian roulette. At some point you may hit that vulnerable period."

31.     Additionally—and ominously—*The San Francisco Chronicle* reported that cardiologists have found that the chance that electric shock will stop the heart is significantly greater for those whose bodies are flooded with adrenaline—precisely the condition typical of individuals most likely to be Tasered by police. Patients with underlying heart problems are also more vulnerable. Not surprisingly, Taser International has never conducted any medical studies on humans addressing the concerns raised by Dr. Tseng.

32.     A prime instance and typical example of defendant's deceptions is the

"Medical Info" section of its corporate website (the "MI Section"), where defendant announces that "Medical Experts Confirm that TASER is Safe," and posts a series of documents that relate to studies that the Company describes as "independent reviews." This superficial presentation dissolves under scrutiny, however. All the studies are flawed in one way or another. Many of the studies are anything but independent; others cite the need for additional testing of the Taser and/or warn of populations that are especially vulnerable to the weapon; most consist of no more than secondary reviews of previous research and scientifically unreliable police reports.

33.     For example, the Stratbucker study, described above, is a blatant instance of the MI Section's false assertion of "independence." Similarly, Dr. Bill Lewinski's study, also described above, is a blatant instance of the MI Section's false assertion that "medical experts confirm that Taser is safe" and "non-lethal."

34.     One case in point of Taser International's false assertions of independence is the ongoing Taser safety study conducted by the University of Wisconsin-Madison (the "Wisconsin Study"). The Wisconsin Study is designed to map Taser "current" in the body and to monitor changes in blood chemistry and respiration in order to provide answers as to how much electrical energy reaches the heart. The study will also examine issues such as fibrillation thresholds, the impact of a variety of stimulant drugs, including cocaine, and changes in blood chemistry. The final report from the Wisconsin Study is scheduled to be made public in mid-2007. In March 2005, Taser International and the professor responsible for overseeing the Wisconsin Study provided a statement to the Associated Press in which Taser International claimed it had no ties to the research.

35.     In May 2005, however, Dr. Stratbucker – Taser International's Medical

Director, was removed as one of the four advisors to the purportedly independent Wisconsin Study. Conveniently, Dr. Stratbucker's resume submitted to the Wisconsin Study made no mention of his *direct* ties to Taser International – even though his resume was incorporated into the study's original grant proposal. Further, the professor overseeing the study, in apparent reliance on the Taser International Medical Director's false resume, checked a box to deny any conflict of interest between Dr. Stratbucker and the Wisconsin Study in the grant proposal.

36.     In light of Taser International's thinly-veiled attempt to influence the "independent" Wisconsin Study, Amnesty International called for an end to the study in May 2005. A spokesman for Amnesty International stated, "This is not independent and there's an appearance that there was an attempt to hide the conflict."

37.     The MI Section scores a double dose of deception when it includes the 2004 DOD Study, which is neither "independent" of Taser International nor "confirm[s]" the safety of its product.

38.     The Department of Defense issued a full version of the DOD Study on March 1, 2005. As mentioned herein, months earlier the Company touted the results of that DOD Study, posting a summary version on the MI Section and proclaiming in an October 2004 press release that, "this comprehensive independent study further supports the safety of Taser" and "reaffirms the lifesaving value of Taser technology."

39.     According to government documents and e-mails recently obtained by *The Arizona Republic*, however, "Taser officials not only participated in three panels to determine the scope of the DOD Study, analyze the data and review findings, it also provided a bulk of the research." When the DOD first released its study, it made no mention

of those involved; an omission the Company pounced on to increase Taser sales by pointing to the new, "independent" report. However, the later, more complete version of the Report clearly shows that the Company's CEO, director of technical services, general counsel, medical director, chief instructor, electrical engineer and vice president of communications were all involved in various panels for the DOD study over the course of a five- month period.

40.     Specifically, when asked about Taser International's involvement in the DOD Study, Larry Farlow, a spokesman for the Air Force Research Laboratory in Texas, which oversaw the study, said, "they were not disconnected from the study." The DOD Report also showed that companies doing business with Taser, including General Dynamics, were heavily involved in the study. In fact, representatives of the various companies, along with Taser executives, participated in the final "Independent External Review Panel" to examine all of the research provided.

41.     After months of repeated statements from corporate headquarters that the DOD study was "independent," in an interview in May 2005, Steve Tuttle ("Tuttle"), the Company's Vice President of communications acknowledged that the Company's employees were involved in the study. But Tuttle continued to tread the Company line, insisting that Taser International did not influence the findings.

42.     Other Air Force researchers stated that the study was not meant to be a comprehensive review of stun-gun science or safety and that no conclusive findings on the device's safety were ever provided. In fact, government officials *urged the Company to commission an independent study* rather than rely on the DOD Study.

43.     E-mails exchanged between military officials also reveal that other

government officials were concerned about the Company's characterization of the study. Captain Daniel McSweeney, a spokesman for the Joint Non-Lethal Weapons Directorate stated, "I've expressed my personal view to (Taser) that the company might want to take a different approach to their (public affairs) efforts" and "*i.e.*, tone it down." Captain McSweeney went on to further say, "my opinion is that they probably want to commission an independent (human effects) study, in which a variety of stakeholders participate." Turning a blind eye to the facts, the Company has been touting the DOD Study's purported findings as conclusive evidence that Taser is safe and effective, despite the fact that the DOD Report made *no* conclusions about the safety of Taser.

44.     Yet another of the MI Section's reports fails on several grounds. A June 2005 report from the Office of the Police Complaint Commissioner of British Columbia, Canada (the "BC Report"), consists, like several of the MI Section's reports, merely of a review of pre-existing literature. The report includes the admissions that: (i) medical doctors were involved in the report only "indirectly as advisors;" and (ii) "it is currently impossible to predict which individuals are clearly at risk of death during police restraint [including Tasers] and there is no medical ability to recommend one method of restraint over another."

45.     The BC Report, however, highlights an area of concern that has been unrecognized by previous studies – the effect that Tasers have on the respiratory system. Based on the concern voiced by the BC Report (and never analyzed by Tazer International), the Wisconsin Study, described herein, will include blood gas monitoring to provide data on acidosis, $CO_2$ levels, and other factors.

46.     Defendant, in a corporate document headlined "TASER Non-Lethal Systems," boasts that it "strongly supports independent reviews" of its product. But only

selectively, it seems.

47.     By way of example, at the American Academy of Forensic Sciences February 2005 conference in New Orleans, Louisiana, Mr. James Ruggieri ("Mr. Ruggieri"), a forensic engineer who has written safety standards for the most respected electrical laboratories and commissions in the world, presented a study demonstrating that the electrical output of the Company's M26 Taser is above the fibrillation threshold for 50% of the population of the United States (the "Ruggieri Presentation"). The Ruggieri Presentation concluded that shocks from Tasers could cause a delayed cardiac arrest and that injuries to officers and suspects who are shocked may be going undetected, pointing to evidence showing that heart damage and fatal heart rhythms can develop hours after electrical shock occurs. The Ruggieri Presentation further concluded that "[t]he Taser can serve a useful role in law enforcement . . . however, it should not be touted as a harmless device."

48.     The Ruggieri Presentation recommended that police departments should stop shocking officers during training exercises and use Tasers on suspects only when no other non-lethal option is available.

49.     In response to the Ruggieri Presentation, defendant issued a press release in which the Company complained that it had not been given the chance to present independent researcher Ruggieri with "technical feedback by reviewing his opinions." In a separate document, defendant slammed the presentation as "ludicrous" and "insupportable," again refusing to acknowledge even the possibility of infirmities in the Company's safety claims.

50.     Defendant's aversion to critical outside studies is further demonstrated by the smoke screen the Company raised in response to the revelation by various media outlets in February, 2005 that the DOD study included concerns about heart damage in individuals

subject to multiple Taser shots. In a corporate press release, defendant in particular denounced a *CBS News* account that the study found that "repeated shocks from a Taser stun gun led to heart damage in pigs." Taser International—ever the innocent whose honor has been impugned—described itself as "deeply concerned" that the media would publicize such "erroneous links," and then launched a barrage of comment from paid medical consultants that questioned the DOD's analysis of heart damage indicator levels, such as acidosis and Troponin T levels) in the pigs' blood.

51.    Defendant's blood chemistry argument was well-calculated to deflect attention from the DOD report's long list of cautionary statements. As the report states in its introductory passages:

> Several data gaps were identified in the data evaluation. These gaps include the biological basis for TASER effects, appropriate dosimetry, and the impact of environmental- and scenario-dependent variables on the induction of effects. Available laboratory data are too limited to adequately quantify all possible risks of ventricular fibrillation or seizures, particularly in susceptible populations.

52.    Among the many nettles in the report's briar patch are: (i) "If long periods of uninterrupted [application of Taser-type jolts] did occur, the risk of unintended adverse effects such as cardiac arrhythmia . . . impairment of respiration, or widespread metabolic muscle damage (rhabdomyolysis) could be severe;" (ii) "In an extreme case of several minutes of exposure during which respiration is impaired, acute respiratory failure, which is immediately life threatening, could plausibly develop;" and (iii) "The potential for seizure induction should be investigated further with analytic models…the data are not adequate to determine with confidence whether a head strike with a TASER dart can induce a seizure."

53.    Among major institutions concerned about the increasing Taser-related deaths and the Company's dubious medical research and safety claims is the Department of

Homeland Security, whose two largest law enforcement divisions have rejected the use of stun guns, almost all of which are manufactured by Taser International, for about 20,000 agents and officers, largely because of questions about the safety of the devices. The bans were adopted by the bureaus of Immigration and Customs Enforcement ("ICE") and Customs and Border Protections in internal directives that were issued during the past two years. Specifically, the ICE's decision was based on several factors including: (1) a lack of conclusive information regarding the use of the devices; (2) the need to determine ICE program office requirements for these devices; (3) a need to study the issues in greater detail prior to authorizing the devices; and (4) the fact that ICE officers have other intermediate use of force devices available to them. Commenting on the safety of stun guns, almost all of which are manufactured by Taser International, Karen Amendola, chief operating officer for the Police Foundation, a law enforcement "think tank" based in Washington, stated: "Clearly, there is not enough information out there on the medical issues and how these devices are being deployed. There needs to be an objective third-party look at this issue."

54. For example, as described above, Taser International has long relied on a study of Tasers by the Air Force, claiming the study shows that the devices are safe. Recently, however, *The New York Times* disclosed that the Company's representations were simply false and misleading because, contrary to Taser International's representations, the Air Force study concluded that more research was needed to determine how Tasers affect the heart. If Tasers are safe and the Company has conducted "extensive medical research," why do so many people in the medical, law enforcement, and human rights communities all state that more research is needed to fundamentally understand how Tasers interact with the

human body? The answer is simple: Taser International's claims of extensive safety research are false and misleading.

55. Significantly, it is in the Company's training of police agencies that it makes its most unqualified assertions of product safety: "proven to be medically safe," "non-destructive to nerves, muscles and other body elements," "will not cause a heart attack or damage a pacemaker." Despite such wide-ranging claims, however, Defendant is no fool, and carefully hedges its bets. Ignoring its own boasts of years of expert testing, the Company in its training manuals disavows sufficient expertise to advise police on actual Taser deployment and tactical policies, on the grounds that "each law enforcement agency is expert in and responsible for their own use of force deployment and post-deployment policies and procedures." So, to protect itself from legal consequences when the purportedly "unforeseen" occurs (as is increasingly the case), the Company's terms and conditions of sale have been amended to include an agreement by purchasing police agencies to indemnify the Company for force-related liability arising from the prescribed use of its product.

56. At the time they purchased Tasers from defendant, Plaintiff and members of the Class were without access to the information concealed and misrepresented by the Company as described herein. Plaintiff and the members of the Class were all supplied with the same promotional materials, advertisements, and "sales pitches" trumpeting Tasers as safe, non-lethal, and backed by extensive medical research. Had Plaintiff and members of the Class known of the true dangerous propensities of Tasers and the falsity of Taser International's claims of extensive medical research, they would have taken steps to avoid those dangers and would not have purchased Tasers from the Company.

57. The Company's safety assertions are clearly false. For many people, use of

Tasers, as directed by the Company (and despite the Company's claims of extensive medical research), has resulted in death, often as a result of cardiac arrest. Put simply, Taser International's "extensive" medical research is anything but.

58.     As a result of deaths and safety concerns, the International Association of Chiefs of Police ("IACP") called for every police department to conduct a review of its Taser policies. On April 4, 2005, the IACP released the results of its study of Taser use by police departments, concluding that there is a need for further research on "outcomes, injuries, and in-custody deaths."

Recently, Taser expansion was halted in Chicago after police, in two separate incidents in February of 2005, shocked a 54-year-old man who later died and a 14-year-old boy who immediately went into cardiac arrest.

59.     Notably, on July 12, 2005, Birmingham, Alabama Mayor Bernard Kincaid ordered Birmingham police officers to halt the use of the department's 135 Tasers, saying more studies are needed on the impact of the stun guns. That decision followed the death of a 41-year-old DUI arrestee who had been Tasered by corrections officers during a confrontation at the Birmingham City Jail.

60.     What everyone seems to be acknowledging, with the exception of Taser International, is that Tasers are very dangerous products that cause serious physical injury and death.

61.     Indeed, as use of the Company's Tasers has become more widespread, Tasers have been implicated in numerous deaths. For example, an ongoing investigation by *The Arizona Republic* has found that 120 people have died in the United States and Canada following police Taser strikes since 1999. As a result, groups such as Amnesty International

have called for a moratorium on the use of Tasers until more studies are completed on their effects on humans.

62. Further, as the death toll from the Company's Tasers has steadily risen, the Company's claims of conducting extensive medical and safety research have been called into question.

63. Specifically, as stated above, Taser International claims to have done "comprehensive medical safety testing" on its Tasers. Reality, however, paints a much different picture. For example, a compilation of articles, research papers, manufacturer documentation, human rights papers, and medical reviews all lead to only one conclusion: there is a lack of conclusive research on the effects of Tasers on humans; the actual effects are not known to any degree of certainty.

64. On May 19, 2005 Dolton P.D. officially suspended the use of all Tasers by order of the Chief of Police, Ronald Burge.

65. In light of the foregoing, upon information and belief, the Company knowingly, intentionally, and recklessly concealed the true safety profile of Tasers in a uniform, nationwide campaign of false and misleading marketing materials. Such concealment included, without limitation, the following:

(a) The Company knowingly, recklessly concealed, or negligently failed to disclose its own data from investigations and other analyses, studies, tests, understandings, and conclusions about the dangerous nature of Tasers and adverse events associated therewith;

(b) The Company knowingly, recklessly concealed, or negligently failed to disclose that the use of Tasers poses a risk of severe personal injury, including death;

(c)     The Company knowingly, recklessly concealed, or negligently failed to disclose that from 1999 to the present, Tasers have been associated with a significantly higher incidence of adverse events than the Company represented to the public (in fact, the Company represents that Tasers have no adverse effects). All of these adverse events resulted in personal injuries, and many resulted in catastrophic personal injuries or death. The Company has deliberately failed to report or acknowledge the validity of this information to the medical community, the public, or the law enforcement community; and

(d)     The Company knowingly, recklessly concealed, or negligently failed to disclose, alert the medical community, the public, and the law enforcement community, properly warn, or otherwise call attention to the misrepresentations concerning the safety testing of Tasers and the dangerous propensity of Tasers, which caused serious personal injuries and death.

E.     Plaintiff and the Class were Damaged by Defendant's Wrongful Conduct

66.     Defendant falsely and deceptively misrepresented or omitted a number of material facts concerning Tasers, including, but not limited to, adverse health effects caused by Tasers, including the frequency, severity, and rapid development of these adverse effects.

67.     Through, among other things, its press releases, advertising campaigns, and marketing materials, defendant has produced and disseminated uniformly misleading communications with and concealment of information from the medical community, the public, and the law enforcement community. Despite its knowledge that Tasers are dangerous and that it has not conducted any scientific, clinical research on the effects of Tasers on humans, the Company continued to vigorously promote and advertise Tasers as non-lethal.

68.     Had Plaintiff and the members of the Class known the full extent of the risks and dangers associated with Tasers, including that they were not as safe as the Company represented, they would never purchased Taser products. Plaintiff and other members of the Class were proximately injured and suffered losses as a result of the Company's knowing, intentional, reckless, and negligent failures to disclose this misconduct.

69.     Defendant knew or should have known that Tasers created significant risks of serious injuries, including death. Defendant failed to make proper, reasonable, timely, or adequate warnings about the risks associated with the use of Tasers and blatantly misrepresented both the quantitative and qualitative aspects of the Company's so-called extensive medical research.

70.     By way of their wrongful misconduct, the Company intended to and did supply Tasers that were dangerous to Plaintiff and the members of the Class, all while misrepresenting the safety profile of Tasers.

## CLASS ACTION ALLEGATIONS

71.     Plaintiff brings this action as a class action for damages, equitable, injunctive, and other relief pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3) on behalf of the following proposed class:

> "All municipalities, cities, agencies, law enforcement or corrections departments, or other similarly situated entities that have purchased Tasers manufactured, supplied, distributed, sold and/or placed in interstate commerce by Defendant for law enforcement or corrections purposes."

72.     Upon completion of discovery with respect to the scope of the Class, Plaintiff reserves the right to amend the Class definition. Excluded from the Class are Defendant, including any parent, subsidiary, affiliate, or control person of defendant; defendant's officers, directors, agents, or employees; the judicial officers assigned to this litigation; and

members of their staffs and immediate families.

73.     Numerosity: The members of the Class are so numerous and geographically diverse that joinder of all of them is impracticable. While the exact number and identities of members of the Class are unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes and therefore aver that there are at least hundreds, if not thousands, of Class members throughout the United States.

74.     Commonality: In this action, there are questions of fact and law common to members of the Class that predominate over any questions affecting any individual members, including, without limitation, the following:

(a)     Whether Taser International markets its Tasers as "non-lethal;"

(b)     Whether in marketing and selling Tasers, the Company failed to disclose the dangers and risks to the health of persons subject to their use;

(c)     Whether Taser International failed to adequately warn of the adverse effects of using Tasers;

(d)     Whether Taser International falsely or fraudulently misrepresented in its advertisements, marketing materials, and other materials, among other things, the safety of and potential harm that can result from Tasers;

(e)     Whether Taser International designed and manufactured Tasers that were dangerously defective because they lead to serious adverse health effects, including, but not limited to, death;

(f)     Whether Taser International knew or should have known that use of Tasers leads to serious adverse health effects, including, but not limited to, death;

(g)     Whether Taser International adequately tested its Tasers prior to distribution and sales in the market place;

(h)     Whether Taser International continued to manufacture, market, distribute, and sell Tasers notwithstanding its knowledge of their dangerous nature;

(i)     Whether the warnings and information Taser International provided with its Tasers were adequate in warning of the potential hazards resulting from their use;

(j)     Whether Taser International knowingly omitted, suppressed, or concealed material facts about the unsafe and defective nature of Tasers from the medical community, the consuming public, or the law enforcement community;

(k)     Whether Taser International breached its contracts with Plaintiff and members of the Class; and

(l)     Whether Plaintiff and the Class have been injured or damaged by virtue of Taser International's conduct.

75.     Typicality:  Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff alleges a common course of conduct by defendant towards members of the Class. Plaintiff Dolton P.D., like other members of the Class, purchased Tasers from Defendant to be used as a non-lethal device for law enforcement purposes. Plaintiff and the other members of the Class seek identical remedies under identical legal theories, and there is no antagonism or material factual variation between Plaintiff's claims and those of the Class.

76.     Adequacy:  Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's claims are coextensive with, and not antagonistic to, the claims of the other members of the Class. Plaintiff is willing and able to vigorously prosecute this action on behalf of the Class, and Plaintiff has retained competent counsel experienced in litigation of this nature.

77.     Plaintiff brings this action under Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact (identified above) predominate over questions of law and fact affecting individual members of the Class. Indeed, the predominant issues in this action are whether Taser International marketed and sold its Tasers as non-lethal

devices to members of the Class for law enforcement purposes. Certification under Rule 23(b)(3) is appropriate because a class action is superior to the other available methods for the fair and efficient adjudication of this action, and Plaintiff envisions no unusual difficulty in the management of this action as a class action.

78. Plaintiff also brings this action under Rule 23(b)(2) because defendant has acted or refused to act on grounds generally applicable to all members of the Class, thereby making final injunctive relief concerning the Class as a whole appropriate. In the absence of appropriate injunctive relief, defendant will continue, under the guise of extensive medical research, to market and sell its Tasers as non-lethal devices to be used for law enforcement purposes. Defendant's uniform conduct towards Plaintiff and the other members of the Class makes certification under Rule 23(b)(2) appropriate.

## COUNT II
## BREACH OF CONTRACT

79. Plaintiff hereby adopts and incorporates by reference paragraphs 1 through 73 as if fully set forth herein.

80. As set forth herein, plaintiff Dolton P.D. entered into an agreement with Taser International for the purchase of Tasers and related equipment such as replacement cartridges, batteries, and chargers.

81. As a result of its extensive marketing campaign built upon false and misleading safety claims, Taser International entered into the same or substantially similar agreements with the other members of the Class.

82. In breach of its agreement to provide Plaintiff and rest of the Class with a safe and non-lethal device, Taser International has provided Plaintiff with Tasers that are unsafe and potentially lethal. As a result, Plaintiff and other members of the Class cannot use the

products in the manner anticipated.

83.     Taser International's failure to provide the product that was agreed upon, i.e., non-lethal, safe Tasers that had been subject to extensive medical testing, to Plaintiff, constitutes a material breach of contract.

84.     As a result of the foregoing, Plaintiff and the members of the Class have suffered damages.

## COUNT III
## UNJUST ENRICHMENT

85.     Plaintiff hereby adopts and incorporates by reference paragraphs 1 through 73 as if fully set forth herein.

86.     Taser International has knowingly and willingly benefited from, accepted payment from Plaintiff and the Class, and has been unjustly enriched at the expense of and to the detriment of Plaintiff and the Class by wrongfully collecting money to which Taser International, in equity, is not entitled.

87.     Plaintiff and members of the Class paid for Tasers for the purpose of purchasing safe, non-lethal means of force for law enforcement purposes.

88.     Plaintiff and members of the Class did not receive a safe, non-lethal product that had been the subject of extensive medical research for which Plaintiff and the Class paid.

89.     Taser International has unjustly retained and failed to refund Plaintiff and members of the Class the amounts wrongfully collected from them, and, under these circumstances, Taser International has been unjustly enriched thereby.

90.     Plaintiff and members of the Class have a claim to the difference between what was charged for the Tasers they purchased from Taser International and the diminished

value of Tasers that are indeed lethal, have not been subject to extensive medical testing, and can reasonably only be used in limited circumstances.

91.     Plaintiff and members of the Class are entitled to recover from Taser International all amounts wrongfully collected and improperly retained by Taser International, plus interest thereon.

92.     As a direct and proximate result of Taser International's unjust enrichment, Plaintiff and members of the Class have suffered injury and seek damages in the amount necessary to restore them to the positions they would be in had Taser International not been unjustly enriched.

## COUNT IV
## MONEY HAD AND RECEIVED

93.     Plaintiff hereby adopts and incorporates by reference paragraphs 1 through 73 as if fully set forth herein.

94.     Taser International has received money from Plaintiff and members of the Class by wrongfully collecting money to which Taser International is not entitled because Taser International knowingly sold Tasers as being non-lethal, and subject to extensive medical research, despite the fact that Tasers can cause serious personal injury, including death and that the Company never conducted extensive medical research.

95.     Plaintiff and members of the Class have a claim to the difference between what was charged for the Tasers they purchased from Taser International and the diminished value of Tasers that are indeed lethal, have not been subject to extensive medical testing, and can reasonably only be used in limited circumstances.

96.     Plaintiff and members of the Class are entitled to recover from Taser International all amounts wrongfully collected and improperly retained by Taser

International, plus interest thereon.

97. It is inequitable and unfair for Taser International to retain Plaintiff's and members of the Class' money. Thus, this money is a debt owed by Taser International to Plaintiff and members of the Class.

98. As a direct and proximate results of Taser International's wrongful conduct, Plaintiff and members of the Class have suffered injury and seek damages in the amount necessary to restore them to the positions they would be in had Taser International not wrongfully collected and retained amounts from the sale of Tasers that are indeed lethal and can reasonably only be used in limited circumstances.

**COUNT V**
**DECEPTIVE ACT OR PRACTICE**

99. Plaintiff hereby adopts and incorporates by reference paragraphs 1 through 73 as if fully set forth herein.

100. Plaintiff brings this Count under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, et seq.

101. The conduct of defendant constituted unfair or deceptive acts or practices.

102. Plaintiff and members of the Class are consumers who purchased defendant's Tasers.

103. At all times relevant to this action, Taser International marketed its Tasers to Plaintiff and members of the Class as "non-lethal," stating that the Company had conducted extensive medical research on the safety of its Tasers.

104. In direct contradiction to its representations, the Company conducted no independent research on the safety of its Tasers. Indeed, reports of deaths following the use of Tasers have steadily risen each year for the past several years.

105.    Defendant's marketing of its Tasers purported safety profile constitutes a deceptive act or practice that directly impacts Plaintiff, the members of the Class, and consumers in general.

106.    Defendant's intent was that Plaintiff and other members of the Class would rely on defendant's deceptive acts or practices in order to increase sales of Tasers as non-lethal devices that could be used in law enforcement.

107.    Defendant's deceptive conduct directly increased its sales of Tasers. Therefore, defendant's deception occurred in the course of conduct involving trade or commerce.

## COUNT VI
## BREACH OF EXPRESS WARRANTY

108.    Plaintiff hereby adopts and incorporates by reference paragraphs 1 through 73 as if fully set forth herein.

109.    Defendant uniformly and expressly warranted to Plaintiff and members of the Class, by and through statements made by the Company or its authorized agents or sales representatives, orally and in publications and all materials intended for consumers, Plaintiff, and the members of the Class, that Tasers were safe, effective, and fit and proper for their intended use as non-lethal devices.

110.    In using and purchasing Tasers, Plaintiff and members of the Class relied on the skill, judgment, representations, and foregoing express warranties of the Company. Said warranties and representations were false in that the aforementioned products were not safe and were unfit for the uses for which they were intended.

111.    As a direct and proximate result of the Company's breaches of warranties, Plaintiff and members of the Class have suffered injury and seek damages in the amount

necessary to restore them to the positions they would be in had Taser International not breached its warranties concerning the safety of its Tasers.

**COUNT VII**
**BREACH OF IMPLIED WARRANTY**

112.     Plaintiff hereby adopts and incorporates by reference paragraphs 1 through 64 as if fully set forth herein.

113.     Prior to the time that Tasers were used by Plaintiff and members of the Class, the Company impliedly warranted to Plaintiff and members of the Class that Tasers were of merchantable quality and safe and fit for the use for which they were intended.

114.     Plaintiff and members of the Class were and are unskilled in the research, design, and manufacture of Tasers and reasonably relied on the skill, judgment, and implied warranty of the Company in using Tasers.

115.     Defendant's Tasers were neither safe for their intended use nor of merchantable quality, as warranted by the Company, in that they have dangerous propensities when put to their intended use that can cause severe injuries, including death.

116.     As a direct and proximate results of Taser International's wrongful conduct, Plaintiff and members of the Class have suffered injury and seek damages in the amount necessary to restore them to the positions they would be in had Taser International not breached its implied warranty concerning the safety of its Tasers.

WHEREFORE, on behalf of themselves and all others similarly situated, Plaintiff respectfully demands a trial and pray for judgment as follows: (a) certifying that this civil action may be maintained as a class action by the Plaintiff as the representative of the Class; (b) for actual damages in an amount to be proven at trial; (c) for pre and post-judgment interest; (d) injunctive relief; and (e) for such other and further relief that this

Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial for all claims so triable.

This ___18___ day of July 2005.

**VRDOLYAK LAW GROUP, LLC**

John K. Vrdolyak
**741 North Dearborn Street**
**Chicago, Illinois 60610**
**Tel: (312) 482-8200**
**Fax: (312) 482-8026**

**CAVANAGH & O'HARA**
**William K. Cavanagh**
**407 East Adams Street**
**P.O. Box 5043**
**Springfield, Illinois 62705**
**Tel: (217) 544-1771**
**Fax: (217) 544-9894**

**LERACH COUGHLIN STOIA GELLER**
**RUDMAN & ROBBINS LLP**
**Paul J. Geller**
**Robert J. Robbins**
**Marisa N. DeMato**
**197 South Federal Highway, Suite 200**
**Boca Raton, Florida 33432**
**Tel: (561) 750-3000**
**Fax: (561) 750-3364**

***Counsel for Plaintiff***

*G:\mdemato\Taser\Dolton PD Complaint v3.doc*

# EXHIBIT A

NOV-04 2004 THU 10:00 AM RAY CREGRON COMPANY        FAX NO. 1/214 943/3808 PM        P. 02    002/002

**** INVOICE ****

ATTN:
GUY L.

| | |
|---|---|
| INVOICE NO: | 0421674-IN |
| INVOICE DATE: | 07/02/04 |
| CUSTOMER NO: | 604190D |
| SALES ORDER NO: | 0413072 |
| SALESPERSON: | DAN YARA |

BILL TO:

DOLTON POLICE DEPT
14030 PARK AVE
DOLTON            IL 60419

SHIP TO:

DOLTON POLICE DEPT
14030 PARK AVE
ATTN: PHIL
DOLTON            IL 60419

CONFIRM TO:  CHIEF RONALD BURGE          DAN FAXED

| PURCHASE ORDER | SHIP VIA: UPS | | | TERMS: NET 30 DAYS | | |
|---|---|---|---|---|---|---|
| ITEM NO | DESCRIPTION | ORD | BO | SHPD | PRICE | AMOUNT |
| SMK/DY | | | | | | |
| 26000TAS | TASER,X26BLK W/LAS SIGHT-S | 4 | | 4 | 799.00 | 3,196.00 |
| | SERIAL # X00-039245 | | | | | |
| | SERIAL # X00-039330 | | | | | |
| | SERIAL # X00-039389 | | | | | |
| | SERIAL # X00-042726 | | | | | |
| 26899 | TEKLOK BELT ATTACHMENT CL1 | 11 | | 11 | 8.95 | 90.45 |
| 44228 | TASER 21FT AIR CART, CASE | 1 | | 1 | 530.60 | 530.60 |
| | ADD ACTUAL FREIGHT CHARGES TO INVOICE | | | | | |

VILLAGE OF DOLTON - POLICE
FEDERAL FORFEITURE ACCOUNT
14030 PARK AVE.
DOLTON, IL  60419

70-894/719
9333427002

1035

DATE 18 Jan 05

PAY TO THE ORDER OF   Ray D Herson          | $ 3842 67/100

Three thow Eight hundred forty two 67/100          DOLLARS

HERITAGE COMMUNITY BANK
13700 S. Indiana • Riverdale, IL 60827

MEMO

⑈071909240⑈ 93334 2700⑈ 1035

| | |
|---|---|
| TOTAL: | 3,825.05 |
| LESS DISCOUNT: | .00 |
| FREIGHT: | 17.62 |
| SALES TAX: | .00 |
| INVOICE TOTAL: | 3,842.67 |

07/05/05  TUE 10:07 FAX                    DOLTON PD                      @006
JAN-18-2005 TUE 01:59 PM RAY O HERRON OF OAKBROOK    FAX NO, 1 630 828 2882    P. 06/07



**Ray O'Herron Co. of Oakbrook Terrace, Inc.**

Suppliers of Police Equipment
17W650 Roosevelt Rd.
Oakbrook Terrace, IL 60181
1-(630) 825-COPS (2677)
Local 1-(630) 792-3674
Fax 1-(630) 629-2882

# Invoice

| Date | Invoice # |
|------|-----------|
| 10/8/2004 | 21265 |

**Bill To**

DOLTON P.D.
ATTN: ACCOUNTS PAYABLE
14030 PARK AVENUE
DOLTON, IL 60419

| P.O. No. | Terms | Rep | Ship Via | P.D. # |
|----------|-------|-----|----------|--------|
| | Net 30 | DY | UPS | 041267 |

| Qty | Item # | Description | Price Each | Amount |
|-----|--------|-------------|------------|--------|
| | | SGT. MOORE | | |
| 20 | TASER | #26800-EXOSKELETON HOLSTER | 39.95 | 799.00 |
| 28 | 44200 | ADVANCED TASER AIR CARTRIDGE-21 FOOT RANGE | 18.95 | 530.60 |
| | | SUBTOTAL | | 1,329.60 |
| 1 | FREIGHT | | 5.35 | 5.35 |

VILLAGE OF DOLTON - POLICE
FEDERAL FORFEITURE ACCOUNT
14030 PARK AVE.
DOLTON, IL 60419

1034

PAY TO THE ORDER OF

HERITAGE COMMUNITY BANK
13700 S. Indiana • Riverdale, IL 60627

$1,334.95

IF A PERSONAL CHECK IS REMITTED, SALES
TAX (6.75%) MUST BE INCLUDED.

$1,334.95

07/05/05   TUE 10:07 FAX          DOLTON PD
JAN-18-2005 TUE 01:50 PM KAYOHERRON COMPANY          FAX NO.          P. 02/03

**** INVOICE ****

INVOICE NO:        0419643-IN
INVOICE DATE:      06/16/04
CUSTOMER NO:       60419PD
SALES ORDER NO:    0412625
SALESPERSON:       DAN YARA

BILL TO:                              SHIP TO:

DOLTON POLICE DEPT                    DOLTON POLICE DEPT
14030 PARK AVE                        14030 PARK AVE
DOLTON          IL 60419              DOLTON          IL 60419

CONFIRM TO:  CHIEF RONALD BURGE

| PURCHASE ORDER | | SHIP VIA:<br>UPS | | | TERMS:<br>NET 30 DAYS | | |
|---|---|---|---|---|---|---|---|
| ITEM NO | DESCRIPTION | | ORD | BO | SHPD | PRICE | AMOUNT |
| DY/JPO | | | | | | | |
| 34228 | TASER 15FT AIR CART, CASE | | 1 | | 1 | | |
| 44228 | TASER 21FT AIR CART, CASE | | 1 | | 1 | 474.60 | 474.60 |
| ADD A | | | | | | 5 | 530.60 |

VILLAGE OF DOLTON - POLICE
FEDERAL FORFEITURE ACCOUNT
14030 PARK AVE.
DOLTON, IL. 60419

70-924/719
833342700                          1030

DATE 18 Jan 05

PAY TO THE
ORDER OF   Ray O Herron          $1013 30/100

One Thousand Thirteen          80/100  DOLLARS

HERITAGE
COMMUNITY BANK
17900 S. Indiana • Riverdale, IL 60627

MEMO

⑆071909240⑆ 933342700⑈ 1030

4855.97

|  |  |
|---|---|
| SUBTOTAL: | 1,005.20 |
| LESS DISCOUNT: | .00 |
| FREIGHT: | 8.10 |
| SALES TAX: | .00 |
| INVOICE TOTAL: | 1,013.30 |

07/05/05  TUE 10:08 FAX
JUN-08-2005 MON 11:22 AM RAY O HERRON OF OAKBROOK    FAX NO. 1 830 829 2882        P. 03

to 16306292682                              at 9/16/2004 7:59 am

**P.D.**  C 11267

RAY O HERRON CO.

NAME  S67  MOORE        DATE: 9-16-04

DEPARTMENT  DALTON PO

ADDRESS
CITY _____ STATE ___ ZIP ___
SIGNATURE                I.D. ___

| CMD | FLD B.O. | NAME | MODEL | SIZE | DESCRIPTION | UNIT | TOTAL |
|---|---|---|---|---|---|---|---|
| 20 | 20 | 8988 | 26800 | | HOLSTER ELDSHELLKW | 39.95 | $ 799 |
| 28 | 28 | 1058C | 44200 | 21" CARTRIDGE | 18.95 | 530.60 |

PO # 848-2151

S.431X          SEP 21, 2004    OCT NT 14.1   BUY 1
SERVICE CARTON             BILL NT 15
TRACKING# 12614931839495407B9
REF 1:  41267
REF 2:

HANDLING CHARGE $0.00
REFERENCE RATE CHARGES:          SERVICE  $5.35
  IY $0.00    HDMT $0.00     RS  $0.00
  DC $0.00    WDMT $0.00     SD  $0.00
  RH $0.00    NTFY $0.00     SP  $0.00
  TOT REF CHG $5.35    REF+HANDLING  $5.35

P.O. No. _____

☐ Pick up    ☒ UPS

17W689 Roosevelt Rd.
Oakbrook Terrace, IL 60181
1-(630) 629-CO5(2627)
Local 1-(630) 782-6674
Fax 1-(630) 629-2682

| | |
|---|---|
| SUB TOTAL | $1329.60 |
| TAX | |
| SHIPPING | |
| TOTAL | |

07/06/05  TUE 10:08 FAX                    DOLTON PD

**TASER** INTERNATIONAL.

# Invoice

**Remit Payment to:**
Taser International
P.O. Box 29661-2016
Phoenix, AZ 85038-9661
Ph. (480) 905-2088
Fax: (480) 991-0791
sales@taser.com
www.taser.com



| INVOICE NO. | PAGE |
|---|---|
| INV041003618 | 1 of 1 |
| INVOICE DATE | |
| 12/16/2004 | |

**Federal Tax I.D.
86-0741227**

**BILL TO:**

DOLTON POLICE DEPARTMENT
14030 S. PARK AVENUE
ATTN: SGT. M. MOORE
DOLTON, IL 60419

**SHIP TO:**

DOLTON POLICE DEPARTMENT
14030 S. PARK AVENUE
ATTN: SGT. M. MOORE
DOLTON, IL 60419

| ORDER NO | ORDER DATE | CUSTOMER NO | LOC | SALESREP |
|---|---|---|---|---|
| SO040975343 | 12/16/2004 | 114844 | AZ | |

Please see reverse side for return and exchange policy. All past due accounts will be charged 1.5% per month. Shipping and handling charges are non-refundable.

| CUSTOMER P.O. NUMBER | | JOB NUMBER | SHIP VIA | PROJECT |
|---|---|---|---|---|
| | | | Fedex - Ground | |

| ITEM NUMBER DESCRIPTION | QTY ORDERED | QTY SHIPPED / QTY BACKORDERED | UNIT PRICE | U/M DISC % | EXTENDED PRICE |
|---|---|---|---|---|---|
| 44203 | 0.00 | 24.00 | 21.97 | EA | |
| Cartridge - 25' Hybrid | | 0.00 | | | 527.28 |
| 44200 | 0.00 | 24.00 | 18.97 | EA | |
| Cartridge - 21' | | 0.00 | | | 455.28 |
| 26700 | 0.00 | 2.00 | 29.95 | EA | |
| DPM Battery PK Assembled | | 0.00 | | | 59.90 |

SAFEGUARD.  UP10 USA  REORDER FROM YOUR LOCAL SAFEGUARD DISTRIBUTOR. IF UNKNOWN, CALL 800-225-3455  M0025F010031M  4/02

**COMMENTS:**

| | |
|---|---|
| SALE AMOUNT | 1,042.46 |
| MISC./HANDLING | 0.00 |
| SHIPPING/FREIGHT | 10.00 |
| SALES TAX | 0.00 |
| TOTAL | 1,052.46 |
| AMOUNT RECEIVED | 0.00 |

**TERMS:**     2/10 Net 30

07/05/05  TUE 10:08 FAX          DOLTON PD                    ☒010

 **TASER**
INTERNATIONAL.

Taser International
7860 East McClain Drive, Suite 2
Scottsdale, AZ 85260
Ph. (480) 991-0797
Fax: (480) 991-0791
sales@taser.com
www.taser.com



| ORDER NO | DATE | PAGE NO |
|---|---|---|
| SO040975343 | 12/14/2004 | 1 of 1 |
| CUSTOMER P.O. NUMBER | | |

**BILL TO:**

DOLTON POLICE DEPARTMENT
Attn:
14030 S. PARK AVENUE
ATTN: SGT. M. MOORE
Dolton, IL 60419
Phone: 708-841-2833

**SHIP TO:**

DOLTON POLICE DEPARTMENT
14030 S. PARK AVENUE
ATTN: SGT. M. MOORE
Dolton, IL 60419

| CUSTOMER NO. JOB NO | SHIP DATE FPD.COL | SHIP VIA WAREHOUSE LOCATION | SHIPPING INSTRUCTION |
|---|---|---|---|
| 114844 | 12/14/2004 | Fedex - Ground | |

| QUANTITY ORDERED | QUANTITY TO SHIP | | ITEM NUMBER DESCRIPTION | UOM | QUANTITY PACKED |
|---|---|---|---|---|---|
| 24.00 | 24.00 | | 44203 Cartridge - 25' Hybrid | EA | 24.00 |
| 24.00 | 24.00 | | 44200 Cartridge - 21' | EA | 24.00 |
| 2.00 | 2.00 | | 26700 DPM Battery PK Assembled | EA | 2.00 |

**Box: 1**

Item: 26700      Qty: 2.00
Item: 44200      Qty: 24.00
Serial No  T04-596410, T04-597757, T04-599443, T04-597676, T04-597766, T04-597755, T04-597765, T04-597678, T04-597683
T04-597782, T04-597770, T04-597769, T04-597768, T04-597763, T04-597672, T04-597761, T04-597753, T04-597764
T04-597684, T04-597752, T04-597375, T04-596417, T04-597767, T04-597687
Item: 44203      Qty: 24.00
Serial No  H04-007410, H04-007475, H04-007414, H04-007479, H04-007420, H04-007419, H04-007406, H04-007413
H04-007409, H04-007407, H04-007418, H04-007422, H04-007497, H04-007421, H04-007408, H04-007500, H04-007501
H04-007495, H04-007412, H04-007404, H04-007502, H04-007494, H04-007490

SAFEGUARD.  LITHO USA   REORDER FROM YOUR LOCAL SAFEGUARD DISTRIBUTOR. IF UNKNOWN, CALL 866-822-8406  MODEL 01005RM  4/02

# EXHIBIT B



**VILLAGE OF DOLTON** ███████████
██████████████ **DEPARTMENT OF POLICE**



RONALD BURGE
CHIEF OF POLICE

| SUBJECT: | PROCEDURE/ POLICY REGARDING THE USE OF THE X26 ADVANCED TASER | |
|---|---|---|
| RELATED DIRECTIVES: | | |

## X26 ADVANCED TASER POLICY
## VILLAGE OF DOLTON POLICE DEPARTMENT

I.  **PURPOSE**

The purpose of this policy sets the guidelines for the Village of Dolton Police Department's policy regarding deployment of the *X26 Advanced TASER*, referred to from here on in as *X26*.

II.  **OVERVIEW**

The X26 is deployed as an officer safety tool and is an addition to other police self-defense techniques and tools. The X26 is to be used to control physically dangerous or violent subjects, when a weapon is involved, or there is reasonable belief that it is unsafe for officers to approach within physical contact range of the offender(s). An officer is not expected to place himself at unreasonable risk to deploy the *TASER* nor shall an officer deploy the *TASER* where facing a firearm or extended distance deadly force threat unless circumstances permit such use.

The X26 has a data port that stores the date and time of each firing of the weapon. The data provides complete and accurate documentation of each firing. The X26 falls in the category of intermediate force technology.

This tool when used pursuant to training is not considered use of Deadly Force or to constitute the infliction of Great Bodily Harm.

14030 Park Avenue • Dolton, Illinois 60419 • Cook County • 708-841-2533 & 2999 • Fax: 708-201-3249

03/22/2005 10:01 FAX
03/21/05 MON 13:36 FAX                    DOLTON PD                              ☒023

A.   The X26 fires two probes up to a distance of 21 feet from a replaceable cartridge. These probes are connected to the weapon by high voltage insulated wire. When the two probes make contact with the target, the X26 transmits electrical pulses along the wires and into the target through up to two inches of clothing. The pulses send 26-watt electrical signals to temporarily override the central nervous system that directly affects control of the skeletal muscles. This electrical impulse causes an uncontrollable contraction of the muscle tissue, allowing the X26 to cause temporary physical debilitation to a person. **This can occur regardless of pain tolerance or mental focus, but officers must be aware that NO technology is guaranteed to stop a violent and determined attacker.**

## III.   PROCEDURE

A.   The X26 shall be issued to and used only by officers who have completed the Village of Dolton Police Department's user or instructor TASER training program.

B.   Only properly functioning and charged X26s shall be carried on duty.

C.   Each discharge, including unintended discharges of an X26, shall be investigated and documented. A detailed police report shall be completed by the officer that discharged the M26 after each use. Discharge of the X26 during an approved training session will not require completion of a report or further investigation, unless an injury occurs during the training session. The X26 will not be demonstrated at any time unless during an approved training session or to test the functionality of the unit in a safe area. The X26 will not be displayed or used in an unnecessary or unprofessional manner.

D.   The X26 is programmed to deliver a 5-second electrical current if the officer releases the trigger after firing. It will continuously discharge if the officer holds the trigger in the firing mode. The officer using the weapon can stop the discharge of the X26 at anytime by manually turning the weapon fire selector to off. It is recommended that during field deployment and use against a violent offender, the full 5-second cycle (or longer as required) be delivered to gain maximum effectiveness and compliance of the offender (s) affected by the X26.

E.   The officer deploying the X26 will NOT aim the X26 at the eyes, face or neck of the offender. The X26 is laser sighted and the top probe will follow the alignment of the front and rear sights and/or the laser aiming sight. The bottom probe will travel at an 8-degree downward angle below the aimed point/laser sighted area. The bottom probe will drop approximately 1 foot for every 7 feet it travels from the weapon to target. The officer shall, where feasible, aim at the center of mass of the offender from the rear. In ideal circumstances, a span of the probes that exceeds 6 inches or more and than makes contact in more than one hemisphere of the body will produce best results as to incapacitation and lessen the chance of ineffective contact.

F.   The officer deploying the X26 must keep his/her hands away from the front of the weapon (discharge area) at all times unless the safety is forward and the X26 is deactivated.

G.   DO NOT fire the X26 near flammable liquids or fumes. The X26 can ignite gas and other flammables. Some self-defense sprays are flammable and should not be used in conjunction with the X26.

H.   Replace the cartridges by the expiration date. All expired cartridges will be turned into the Training Commander or Designee for use during training exercises or for disposal.

I.   The Training Commander or Designee shall be responsible for the charging of the TASER's battery pack or exchange of replacement batteries.

## IV.   TRAINING COMMANDER OR DESIGNEE RESPONSIBILITIES

A.   Review each use of an M26 by officers. (Detailed Case Report)

B.   Oversee the X26.

    1.   A certified X26 instructor will conduct training, basic user certification for the M26.

    2.   All training shall be coordinated through the Training Commander or Designee.

## V.   M26 EQUIPPED OFFICERS

A.   Officers so designated by the shift supervisor on each shift shall carry the X26 on duty.

B.   The X26 shall be carried in a specifically designed holster opposite the officer's duty handgun in a fully loaded condition with at least one extra 21 foot cartridge in the holster. The M26 may also be secured within a cargo pocket of the uniform pants WITHOUT the cartridge locked in the front firing port.

C.   The Commander of Training or Designee will record the serial number of the TASER and the Cartridges used for each TASER

D.   When not in use the X26 shall be properly secured and will only be removed from the holster / carry pocket or other secured location when it is to be checked, discharged or taken in / out of service. The X26 is not to be subjected to prolonged heat or cold. The X26 when not deployed for training or field use will be stored in a secure location.

E.   Ensure the batteries of the X26 are charged. When checking the batteries, the air cartridge must be removed. A blinking or solid LED light indicates the X26 had been turned on. The X26 shall be tested at the beginning and end of each shift without a cartridge locked in place. If the spark rate of the test firing is so slow that the discharges can be counted, the batteries are too weak for deployment and will be charged or replaced.

F.   Before discharging the X26, the officer should notify other officers on the scene and responding officers so that they are aware that its use is imminent. This should be done by using the code word "TASER".

G.   The air cartridge and probes shall be retained as evidence. Unless required for evidentiary needs, the wires may be discarded and the sharp end of the probes inverted into the portals of the fired cartridge. This will prevent the sharp ends from penetrating the evidence envelope. Tapes should be placed over the portals to ensure the probe is in the cartridge. The evidence shall be placed in a biohazard container and sealed.

## VI.   TREATMENT OF PERSONS SUBJECTED TO THE X26

The following issues are subject to both availability and participation of paramedic response:

A.   After securing the offender in handcuffs or other appropriate restraints, the X26 deploying officer or other officers on scene shall evaluate the offender to determine if a X26 probe has penetrated the skin. If control of the offender is in question, the probes may be left in place to afford additional control during transportation to the department or other facility. If the offender is under control, an officer or supervisor at the scene may remove the TASER probe (s) ensuring after removal that the probe is intact and no part of the probe remains in the offender. Should a situation such as a probe striking a sensitive area of the body such as the face, neck, or groin, etc. require medical intervention to remove the probe(s), the offender will be transported by paramedics to a medical facility.

Officers must be aware that one aspect of potential injury in deploying the X26 against a violent or combative offender is that of falling from a standing position. The X26 officer or on scene Supervisor may request a paramedic unit to perform a thorough physical examination with the emphasis on secondary injuries and then transport to a hospital facility, if required by the condition of the offender.

## VII.   TACTICAL DEPLOYMENT

A.   Where feasible (Tenn. v. Garner), use verbal commands and point the laser sight at the offender prior to firing.

B.   Have additional cartridge(s) available or a second X26 ready to fire in the event the probe (s) miss the target or there is a malfunction.

C.   Have back-up present to prepare to make physical apprehension or use other force options as appropriate and necessitated by the situation.

D.   Use cover and distance to insure officer safety.

E.   Avoid use near roofs or on the edge of buildings to eliminate the possibility of the offender falling.

F.   Avoid use on an offender in deep bodies of water due to the chance of drowning.

**VIII.**   **RESPONSE TO RESISTANCE ISSUES**

    **A.**     The X26 ordinarily should not be deployed at distances beyond 18 feet due to separation distance between the probes.

        Other deployment considerations include imminent threat to officers or others, offender actively resisting arrest, use of a weapon, severity of the crime, attempting to evade arrest by fight.

        *Officer v. Offender factors that may be considered in the use of force response:*

        1.   Age

        2.   Sex

        3.   Pregnancy (avoid use if visibly pregnant)

        4.   Skill level (fighting ability)

        5.   Multiple subjects / officers

        6.   Relative strength.

        *Special Circumstances:*

        1.   Closeness of weapon

        2.   Injury or exhaustion of officer

        3.   Officer on ground

        4.   Distance between officer and subject

        5.   Special knowledge

        6.   Availability of other options

**IX.**   **M26 ADVANCED TASER INSTRUCTOR**

    The X26 Instructor shall:

    **A.**     Receive, inspect, and ensure the maintenance and replacement of the X26 devices assigned to departmental personnel.

    **B.**     Establish and maintain systems to record issuance of the X26 and the air cartridges. Serial Numbers will be recorded.

03/22/2005 10:02 FAX
03/21/05 MON 13:39 FAX                    DOLTON PD                          ☒027
                                                                            ☒026

C.   Maintain an adequate supply of batteries and air cartridges for replacement.

D.   Return defective or damaged X26 TASERS and cartridges to supplier.

E.   Obtains service and/or replacement for defective or damaged X26 components from the supplier.

F.   The Detective will receive and maintain used cartridges packaged as evidence.

G.   Provide annual re-training to certified users.

H.   Review copies of the "Supervisory TASER Use Report" for completeness.

I.   Maintain training updates from Air TASER International.


By Order Of:

*Ronald Burge*
Chief of Police

Effective Date: May 17, 2004